IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br>AEROGROUP INTERNATIONAL, INC., *et al.*,<br><br>Debtors. | Chapter 11<br>Bankr. No. 17-11962 (CSS)<br>(Jointly Administered) |
| POLK 33 Lending, LLC,<br><br>Appellant,<br><br>v.<br><br>THL CORPORATE FINANCE, INC.,<br><br>Appellee. | C.A. No. 19-648 (MN) |

## **MEMORANDUM OPINION**

Robert M. Hirsh, Beth M. Brownstein, ARENT FOX LLP, New York, NY; James H. Hulme, Jackson D. Toof, ARENT FOX LLP, Washington, DC; Frederick B. Rosner, Scott J. Leonhardt, Jason A. Gibson, THE ROSNER LAW GROUP LLC, Wilmington, DE – Attorneys for the Appellant Polk 33 Lending, LLC.

Matthew M. Murphy, Nicholas A. Bassett, Brendan M. Gage, PAUL HASTINGS LLP, Chicago, IL; M. Blake Cleary, Michael Neiburg, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – Attorneys for Appellee THL Corporate Finance, Inc.

August 27, 2020
Wilmington, Delaware

*Maryellen Noreika*
**NOREIKA, U.S. DISTRICT JUDGE**

Pending before the Court is an appeal by Polk 33 Lending, LLC ("Polk") of the Bankruptcy Court's March 26, 2019 decision, *Polk 33 Lending, LLC v. THL Corporate Finance, Inc. (In re Aerogroup Int'l, Inc.)*, 601 B.R. 571 (Bankr. D. Del. 2019) ("Allocation Decision") and accompanying Order (Bankr. D.I. 1132)[1] ("Order") in the chapter 11 cases of Aerogroup International, Inc. and certain affiliates (together, "Aerogroup" or "Debtors"). By the Allocation Decision and Order, the Honorable Kevin J. Carey[2] allocated proceeds from the Debtors' 11 U.S.C. § 363 asset sale between two lenders with competing secured claims – appellant Polk and appellee THL Corporate Finance, Inc. ("THL"). *See Aerogroup,* 601 B.R. at 598.

The Allocation Decision adjudicated the lenders' allocation dispute consistent with the Bankruptcy Court's prior denial of Polk's summary judgment motion, in which Polk asserted that claim. *See In re Aerogroup Int'l, Inc.*, 2018 WL 3155250, *3-*4 (Bankr. D. Del. June 25, 2018) ("Summary Judgment Decision"). The Bankruptcy Court denied summary judgment, citing a "dispute over the material fact of whether THL's credit bid was a 'final bid'" and further rejecting Polk's argument "that the secured portion of THL's claim is determined by its Credit Bid rather than the market price for the collateral." *Id.* at *3-*5.

Following a two-day evidentiary hearing, and a detailed determination of the value of the individual assets underlying each lender's claim, the Allocation Decision found that the value of

---

[1] The docket of the Chapter 11 cases, captioned *In re Aerogroup Int'l Inc.,* Case No. 17-11962 (CSS) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __." The appendix filed in support of Polk's opening brief (D.I. 11) is cited herein as "A__," and the appendix filed in support of THL's answering brief (D.I. 21) is cited herein as "AA__."

[2] Pursuant to an order dated June 6, 2019 (Adv. D.I. 26), the above-captioned chapter 11 cases and all associated cases, including the adversary proceeding, were reassigned to the Honorable Christopher S. Sontchi.

THL's secured collateral was $16.8 million and allocated the sale proceeds in accordance with the parties' agreements.  *See Aerogroup,* 601 B.R. at 598.

On appeal, Polk argues that the portion of the Allocation Decision fixing the value of THL's secured collateral at $16.8 million must be vacated because that amount exceeds the $12.2 million amount that THL, as a secured party, credit bid during the Debtors' auction.  According to Polk, Third Circuit precedent is clear that a credit bid sets the value of a lender's secured interest in collateral, regardless of whether that credit bid is ultimately the successful bid at a public auction.  The Court disagrees.  As set forth below, the Court will affirm the Order.

I. **BACKGROUND**

A. **Chapter 11 Cases**

Prior to filing the chapter 11 cases, the Debtors were a leading manufacturer and retailer of women's footwear.  On September 15, 2017 ("the Petition Date"), the Debtors commenced the chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtors' outstanding obligations were held in a "split lien" collateral structure for the benefits of THL, as administrative agent for the Debtors' prepetition term loan lenders, and, originally by Wells Fargo, N.A. ("Wells Fargo") as administrative agent for the Debtors' prepetition revolver lenders.  Following the Petition Date, the Debtors filed a motion to approve a $25 million debtor-in-possession financing ("DIP") facility from Polk.  The proposed DIP facility contemplated, in part, paying the Wells Fargo prepetition indebtedness in return for Polk receiving a rolled-up, postpetition superpriority administrative expense claim.  THL objected, the parties negotiated a consensual order, and, on November 2, 2017, the Bankruptcy Court entered a final order approving the DIP facility ("the Final DIP Order").

Pursuant to the Final DIP Order, Polk holds a first lien on all "DIP Priority Collateral," which includes the Debtors' inventory and working capital, and the proceeds therefore; THL holds a lien on all "Term Priority Defined Collateral," which includes the Debtors' intellectual property, goodwill, and all proceeds therefrom.

### B. The Auction and Credit Bid

On February 15-16, 2018, the Debtors auctioned substantially all of their assets ("the Auction"). Parties represented at the Auction included THL, Alden Global Capital, LLC ("Alden"), Aero IP Group ("Aero IP"), Polk, and the Debtors. Approximately midway through the Auction, THL submitted a credit bid ("the THL Credit Bid") for the Debtors' intellectual property alone, which was THL's Term Priority Defined Collateral under the Final DIP Order; the bid would leave in the estate other assets such as inventory and accounts receivable. The most-recent pending bid at the time was a bid by Aero IP for approximately $17,206,588 and that was a bid for substantially all of the assets, including the intellectual property, inventory, and accounts receivable. Although the face amount of THL's claim was more than $24 million, THL did not credit bid the full amount at that time. THL submitted only the minimum incremental bid required under the bidding procedures, which was $12,209,519. *See Aerogroup*, 601 B.R. at 580-81; A137 (Bankr. D.I. 654), 2/15/18-2/16/18 Hr'g Tr. at 140:10-11. Although the THL Credit Bid was on its face less than the Aero IP Bid, THL was bidding only on its collateral, and an allocation of value was done by the Debtors to determine whether the bid was higher or otherwise better. Shortly after THL's Credit Bid, the Auction record was paused. (*See* AA00260 (Handy Decl. ¶ 7); AA00264 (Cleary Decl. ¶ 8). During the recess, counsel for the Debtors conferred with THL off the record. The Debtors asked THL to refrain from bidding for a period of time while bidders seeking to acquire the entire business built momentum. *Aerogroup,* 601 B.R. at 580-81. "THL

3

agreed to temporarily refrain from bidding, but reserved its right to resume credit bidding if other bidders did not bid amounts satisfactory to THL." *Id*. at 581 (citing A013 (Handy Decl. ¶¶ 7-8)). After the Auction resumed, Alden and Aero IP continued bidding. Ultimately, the Debtors selected Alden as having made the highest and best bid at the Auction with a bid of $26,175,000 ("the Alden Bid"). *Id.* The Debtors selected Aero IP's later bid of approximately $20 million as the backup bid ("the Aero IP Bid"). *Id.* at 580.

On February 16, 2018, the Bankruptcy Court held a hearing and confirmed the sale of the Debtors' assets to Alden ("the Sale Hearing"). At the Sale Hearing, THL noted that it did not believe the Aero IP Bid attributed sufficient value to THL's collateral and reserved THL's right to credit bid should the Alden Bid fail to close and the Debtors seek to consummate the Aero IP Bid.[3] Counsel for the Debtors acknowledged that THL was "reserving [its] rights as [it] ha[d] done throughout."[4] On March 6, 2018, the sale to Alden closed, and the proceeds from the sale were deposited in escrow.

### C. Summary Judgment Decision and Allocation Decision

On April 24, 2018, THL filed a motion with the Bankruptcy Court (i) seeking determination of the value of THL and Polk's secured claims for purposes of determining how the Sale Proceeds should be allocated between THL and Polk's respective first lien collateral pools

---

[3] *See* AA0092 (Bankr. D.I. 699) 2/16/18 Hr'g. Tr. at 32:4-10) ("On this particular bid is the back-up bidder. We would – in the event that this becomes relevant I think we would need an opportunity to then credit bid on our collateral because we don't believe the value attributed to our collateral, by virtue of this back-up bidder, is sufficient. So I can't stand here before you today and say that this back-up bid is okay for my client.").

[4] *See* AA0092 (Bankr. D.I. 699) 2/16/18 Hr'g. Tr. at 32:24-25). Counsel for the Debtors later again agreed with THL that although "nobody wanted to do this for [naught] . . . as [counsel for THL] has said if the proceeds aren't high enough they have reserved their rights." (AA0094 at 34:12-14). Counsel for the Debtors also noted that they "did ask THL to say that they accepted [the Alden Bid] as the highest and best." (*Id*. at 34:9-10).

and (ii) directing the Debtors to thereafter make distributions (A246-A517) ("Allocation Motion"). On May 8, 2018, Polk objected to the Allocation Motion. (AA00109-AA00244). On June 8, 2018, the day after a mediation session between the parties failed to produce a settlement, Polk filed a motion for summary judgment in connection with THL's Allocation Motion, arguing that THL's "final" credit bid at the auction set the value of its secured claim (A518-A609) ("Summary Judgment Motion").

On June 25, 2018, the Bankruptcy Court issued the Summary Judgment Decision and accompanying order denying Polk's Summary Judgment Motion. *Aerogroup*, 2018 WL 3155250, at *5. In the Summary Judgment Decision, the Bankruptcy Court framed the issue as follows: "Relying on the Third Circuit's decisions in *Submicron*[5] and *Philadelphia Newspapers*,[6] Polk argues that THL's 'final' Credit Bid established the secured amount of THL's claim." *Id.* at *3. The Bankruptcy Court held there was "a dispute over the material fact of whether THL's credit bid was a 'final' bid." *Id.* Regarding Polk's analysis of *SubMicron* and *Philadelphia Newspapers*, the Bankruptcy Court remarked: "THL also contends that Polk's arguments rely on a disingenuous and misleading misinterpretation of Third Circuit law. I agree." *Id.* at *4. In analyzing the language Polk cited from those decisions, the Bankruptcy Court held:

> Polk's argument relies on language plucked out of cases without context and fails to recognize the basic premise: an auction allows the marketplace to determine the value of the collateral, which, in turn, determines the value of the secured portion of [the] claim. In other words, the highest bid—no matter who makes it—sets the asset's value.

*Id.* at *5 (footnote omitted).

---

[5]   *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys., Corp.)*, 432 F.3d 448 (3d Cir. 2006).

[6]   *In re Philadelphia Newspapers, LLC*, 599 F.3d 298 (3d Cir. 2010), *as amended* (May 7, 2010).

On June 29, 2018 and July 13, 2018, the Bankruptcy Court held an evidentiary hearing on several matters, including THL's Allocation Motion. On March 26, 2019, the Bankruptcy Court issued its thorough Allocation Decision and Order, in which, among other things, the Bankruptcy Court allocated $16.8 million of the Sale Proceeds to THL's Term Priority Defined Collateral and $7.45 million to Polk's DIP Priority Collateral. *Aerogroup,* 601 B.R. at 598-99. As a factual matter, the Bankruptcy Court held that the Debtors had asked THL to stop credit bidding so as not to interfere with the active bidding of other cash bidders and that "THL agreed to temporarily refrain from bidding, but reserved its right to resume credit bidding if other bidders did not bid amounts satisfactory to THL." *Id.* at 581. "[T]he evidence show[ed] that THL's credit bid was not a final offer." *Id*. at 589. Aside from this appeal, all issues related to the allocation and distribution of the Sale Proceeds have been resolved. (*See* AA00276 (B.D.I. 1203), 5/30/19 Hr'g Tr. at 9:7).

### D. Certification Request and Appeal

On April 8, 2019, Polk appealed the Order. (D.I. 1). On May 28, 2019, Polk filed its Request for Order Certifying Order for Direct Appeal to the Court of Appeals for the Third Circuit (D.I. 14) ("Certification Motion"), which sought certification under 28 U.S.C. § 158(d)(2)(A) of the following issue: "Whether a secured lender's bid at a § 363 auction sets the value of the secured lender's collateral at the amount of the credit bid, if that bid is never withdrawn." (D.I. 14 at 1). The Certification Motion was fully briefed (D.I. 12, 15, 19), and, on February 14, 2020, the Court issued a Memorandum and Order denying the Certification Motion. (D.I. 23).

The merits of the appeal are fully briefed. (D.I. 10, 20, 22). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). The Bankruptcy Court's legal conclusions are reviewed *de novo*, its factual findings for clear error, and its exercises of discretion for abuse. *See In re Michael*, 699 F.3d 305, 308 n.2 (3d Cir. 2012). A factual finding is clearly erroneous only if it "either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995) (internal quotation marks omitted). When there are multiple ways to view the evidence, "the [bankruptcy court's] choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## III. DISCUSSION

Section 363(k) of the Bankruptcy Code permits a secured creditor to credit bid up to the entire face amount of its claim when its collateral is being sold at a bankruptcy auction. 11 U.S.C. § 363(k). "This credit bid provision 'gives the secured creditor protections against attempts to sell the collateral too cheaply; if the secured party thinks the collateral is worth more than the debtor is selling it for, it may effectively bid its debt and take title to the property.'" *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 679 (D. Mass. 2000) (quoting 7 Collier on Bankruptcy ¶ 1129.05[2][b], at 1129–34 (15th ed. rev. 1998)). "The ability to credit bid provides a weapon for a secured creditor who is dissatisfied with a potential sales price to increase the bid to what it deems to be fair market value, thereby protecting the benefit of its bargain." *In re Philadelphia Newspapers, LLC*, 418 B.R. 548, 563 (E.D. Pa. 2009), *aff'd*, 599 F.3d 298 (3d Cir. 2010).

Polk's position on appeal is that, when THL submitted its credit bid of approximately $12.2 million for certain of its collateral at the auction of the Debtors' assets, THL capped the value of

7

its secured claim, even though: (a) THL's credit bid was exceeded by higher bids that led to the eventual sale of the assets for $25.45 million, and (b) the Bankruptcy Court made the factual determination that THL's credit bid was not final. Pulling statements from the Third Circuit decisions in *SubMicron* and *Philadelphia Newspapers* – which form the sole legal basis for Polk's appeal – Polk claims that "ironclad and binding Third Circuit precedent" supports its position that "any amount bid" by a secured lender "up to the value of Lender's full claim becomes the secured portion of [the] Lender's claim by definition" and that "this rule applies even if the secured lender's credit bid is not successful." (D.I. 10 at 9).

Conversely, THL argues "a credit bid is treated the same as a cash bid; thus, ***at the time the credit bid is made***, it temporarily sets the value of the secured creditor's collateral, just as a cash bid would. To the extent a subsequent cash bid surpasses the credit bid, then that greater cash bid sets the value of the secured creditor's collateral, as well as the value of the creditor's secured claim." (D.I. 20 at 2). According to THL, "[t]his is basic economics: the value of an asset serving as collateral is, of course, determined by the highest bid for that asset, not by intermittent lower bids made for the asset during an auction." (*Id.*) THL further argues that Polk has pulled select language from *SubMicron* and *Philadelphia Newspaper* and applied it out of context. THL argues that *SubMicron* stands for the opposite proposition: that the highest price bid for collateral at an auction — whether in the form of a cash bid or a credit bid — determines the value of a secured creditor's claim. With respect to *Philadelphia Newspapers*, THL argues that it is inapposite, as it (i) simply references *SubMicron* without modifying or expanding its relevant holding, and (ii) addresses the question of whether a particular secured creditor has the right to credit bid (something not at issue here), not the value of its secured claim. (*Id*.)

8

### A. The Bankruptcy Court Correctly Rejected Polk's Argument that a Creditor's Secured Claim is Capped by a Credit Bid that is Subsequently Exceeded by a Higher Bid

On appeal, Polk relies on the same language from the Third Circuit's *SubMicron* and *Philadelphia Newspapers* decisions as it did in its Summary Judgment Motion. Polk argues that it is controlling law in this circuit that "any amount bid" by a secured lender "up to the value of Lender's full claim becomes the secured portion of [the] Lender's claim by definition." (D.I. 10 at 9 (quoting *SubMicron*, 432 F.3d at 459-61)). According to Polk, "this rule applies even if the secured lender's credit bid is not successful." (*Id.* (citing *Philadelphia Newspapers*, 599 F.3d at 311)). This same argument was found by the Bankruptcy Court to be a "disingenuous and misleading misinterpretation of Third Circuit law." *Aerogroup*, 2018 WL 3155250, at *4.

#### 1. *SubMicron* Does Not Support Polk's Argument

The Court agrees with THL that *SubMicron* contradicts Polk's position. *SubMicron* stands for two propositions. First, a creditor may credit bid up to the face amount of its claim under the plain language of § 363(k) of the Bankruptcy Code in a sale of its collateral. *See SubMicron*, 432 F.3d at 459 ("Because . . . section [363(k)] empowers creditors to bid the total *face* value of their claims – it does not limit bids to claims' economic value – we . . . hold that the District Court did not err in allowing the Lenders to credit bid their claims.") (emphasis in original); *see id.* at 461 ("That is, § 363(k) speaks to the full face value of a secured creditor's claim, not to the portion of that claim that is actually collateralized as described in § 506."). Second, a credit bid is not conditioned on a creditor having to show that its collateral has any economic value. *See id.* at 460–61. In other words, the creditor is free to bid whatever amount of the debt it wishes regardless of the economic value of the collateral or the value of any cash bids for the collateral. Nothing in *SubMicron* stands for the proposition that a credit bid caps the value of a secured creditor's claim.

9

In *SubMicron*, a plan administrator argued that certain lenders could not credit bid the full value of their claims because the lenders "did not (and could not) demonstrate that some portion of their claims remained secured by collateral as defined in Bankruptcy Code § 506(a)." *Id.* at 459 (alteration in original); *see also In re Fisker Auto. Holdings, Inc.*, 2014 WL 576370, at *3 (D. Del. Feb. 12, 2014) (describing this as the "sole issue [in *SubMicron*] regarding credit bidding under Section 363(k)"). The Third Circuit rejected this argument. It held that the plain language of § 363(k) of the Bankruptcy Code allows a secured creditor to bid the face amount of its claim in a sale of its collateral without a showing that the collateral has any economic value.

The Third Circuit explained that interpreting § 363(k) to cap credit bids at the economic value of the collateral would be "theoretically nonsensical," *SubMicron*, 432 F.3d at 460, because ultimately the highest price bid for the collateral (whether or not a credit bid) sets the creditor's secured claim. To illustrate this point, the *SubMicron* court provided a hypothetical where a lender with a security interest in a truck ("T") was owed $15 and a debtor proposed selling T to a bidder for $10 and capping the lender's credit bid for T at $10. *Id.* The court observed:

> This hypothetical reveals the logical problem with an actual value bid cap. If Lender bids $12 for T, by definition $12 ***becomes*** the value of Lender's security interest in T. In this way, until Lender is paid in full, Lender can always overbid Bidder. (Naturally, Lender will not outbid Bidder unless Lender believes it could generate a greater return on T than the return for Lender represented by Bidder's offer.) As Lender holds a security interest in T, any amount bid for it up to the value of Lender's full claim becomes the secured portion of Lender's claim by definition.

*Id*. (emphasis in original). The *SubMicron* court used this illustration to show that if a creditor uses a credit bid to ***outbid*** another bidder, the creditor's bid, by definition, establishes the value of its secured claim, as would be true if another bidder outbids the creditor. The court's observation stands for the logical proposition that the value of a creditor's secured claim is determined by the highest bid for its collateral (whether that bid is from the creditor or from another bidder).

The Third Circuit also rejected the plan administrator's argument that a different rule should apply when collateral has no economic value at all. In doing so, the court reiterated that the ultimate sale price determines the value of the creditor's claim, noting that, "[b]ecause the Lenders had a valid security interest in essentially all the assets sold, ***by definition they were entitled to the satisfaction of their claims from available proceeds of any sale of those underlying assets***." *Id*. at 461 (emphasis added).

The Third Circuit's statements stand in clear opposition to Polk's contention that THL is not entitled to any of the proceeds generated from the sale of its collateral in excess of the incremental credit bid submitted at the action and, thus, does not benefit from the market's assessment of the value of that collateral. The Alden Bid established that the market deemed the sold assets to be worth collectively $26,175,000. Next, the Bankruptcy Court analyzed in the Allocation Decision how the Sale Proceeds should be allocated based on testimony concerning the value of THL and Polk's respective first lien collateral comprising the Sale Proceeds. By allocating $16.8 million of the Sale Proceeds to THL – approximately $4.6 million over THL's Credit Bid – the Allocation Order enforces *SubMicron*'s principles that the market (the price paid for collateral) determines a creditor's secured claim.

Polk goes further to suggest that *SubMicron* supports the view that a credit bid under § 363(k) caps only the secured portion of the claim under § 506(a)(1), leaving an undersecured creditor with a deficiency claim for the balance of the debt. (*See* D.I. 10 at 13). This is only true, however, where the credit bid is the highest price bid for the collateral. The Court agrees with THL that reading § 363(k) as bifurcating secured and unsecured claims premised on credit bids that are exceeded by higher bids contradicts *SubMicron*'s holding that § 363(k) "is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth."

11

*SubMicron*, 432 F.3d at 461.

### 2. *Philadelphia Newspapers* Does Not Support Polk's Argument

Appellant argues that in *Philadelphia Newspapers*, issued four years after *SubMicron*, the Third Circuit "reinforced its holding that a secured creditor's credit bid establishes the value of that lender's secured interest in the collateral — even if that bid was not ultimately successful at auction." (D.I. 10 at 11). Appellant relies on a quote from the *Philadelphia Newspapers* decision: "*SubMicron* is consistent with our analysis in this case. Our holding that a credit bid sets the value of a lender's secured interest in collateral does not equate to a holding that a credit bid must be the successful bid at a public auction." (*Id*. (quoting *Philadelphia Newspapers*, 599 F.3d at 312). THL argues that *Philadelphia Newspapers* is a plan confirmation case that restates *SubMicron*'s holding in dicta. Moreover, THL argues, the Supreme Court has since implicitly overruled *Philadelphia Newspapers*. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012).

As a threshold matter, *Philadelphia Newspapers* did not involve a secured creditor that had made a credit bid at an auction. Rather, the issue in *Philadelphia Newspapers* was whether a secured creditor could be denied the right to credit bid in connection with the sale of its collateral under a plan of reorganization so long as the creditor was provided with the "indubitable equivalent" of its collateral under § 1129(b)(2)(A)(iii) of the Bankruptcy Code. The Third Circuit held that such a plan was permissible under the plain language of the Bankruptcy Code,[7] and this conclusion was rejected in *RadLAX* by the Supreme Court. [8]

---

[7] *Philadelphia Newspapers*, 599 F.3d at 311 ("A plain reading of § 1129(b)(2)(A)(iii) therefore compels the conclusion that, when a debtor proceeds under subsection (iii), Congress has provided secured lenders with no right to credit bid at a sale of the collateral.").

[8] *RadLAX*, 566 U.S. at 647 ("Thus, debtors may not sell their property free of liens under § 1129(b)(2)(A) without allowing lienholders to credit-bid, as required by clause (ii).").

As THL points out, in *Philadelphia Newspapers*, the Third Circuit only referenced its earlier holding in *SubMicron* after the secured lenders had argued that a plan denying them the right to credit bid was inconsistent with *SubMicron*. *Philadelphia Newspapers*, 599 F.3d at 311. In response to the lenders, the *Philadelphia Newspapers* court remarked:

> *SubMicron* is consistent with our analysis in this case. Our holding that a credit bid sets the value of a lender's secured interest in collateral does not equate to a holding that a credit bid must be the successful bid at a public auction. Rather, a court is called at plan confirmation to determine only whether a lender has received the "indubitable equivalent" of its secured interest. Logically, this can include not only the cash value generated by the public auction, but other forms of compensation or security such as substituted collateral or, as here, real property. In other words, it is the plan of reorganization, and not the auction itself, that must generate the "indubitable equivalent." For this reason, the District Court noted that Lenders "retain the right to argue at confirmation, if appropriate, that the restriction on credit bidding failed to generate fair market value at the Auction, thereby preventing them from receiving the indubitable equivalent of their claim.

*Id.* at 312. The Court agrees with THL that, understood in the proper context, the majority's discussion of *SubMicron* is an attempt to explain why denying credit bidding in a sale under a plan is consistent with permitting credit bidding in a sale outside of a plan. According to the majority, a plan that prohibits credit bidding is consistent with *SubMicron* because under a plan the secured creditor could receive real property, cash, and/or other consideration and satisfy the indubitable equivalent of the secured creditor's claim (a conclusion rejected by the Supreme Court in *RadLAX*).[9] Polk, however, presents *Philadelphia Newspapers* as a decision in which the Third Circuit reinforced its holding that a secured creditor's credit bid at an auction may be used to establish a limitation and maximum value for that secured creditor's claim. Polk does this by

---

[9] 566 U.S. at 649 ("As a matter of law, no bid procedures like the ones proposed here [denying the bank the right to credit bid] could satisfy the requirements of § 1129(b)(2)(A), and the distinction between approval of bid procedures and plan confirmation is therefore irrelevant.").

13

bolding one sentence from the decision – "Our holding that a credit bid sets the value of a lender's secured interest in collateral does not equate to a holding that a credit bid must be the successful bid at a public auction" – and presenting this sentence as a new rule of law in the Third Circuit regarding limitations on credit bidding under § 363(k) of the Bankruptcy Code. The Court agrees with THL that the cited language explained that a credit bid need not be the winning bid at an auction in order for a plan to be confirmed under § 1129(b)(2)(A)(iii).

Finally, it is unclear how much of the credit bidding commentary in *Philadelphia Newspapers* remains good law in light of *RadLAX*. *RadLAX* held that a plan that provides for the sale of collateral but does not permit credit bidding cannot be confirmed under the indubitable equivalent prong of § 1129(b)(2)(A) of the Bankruptcy Code. *RadLAX*, 566 U.S. at 649 ("Because the RadLAX debtors may not obtain confirmation of a Chapter 11 cramdown plan that provides for the sale of collateral free and clear of the Bank's lien, but does not permit the Bank to credit-bid at the sale, we affirm the judgment of the Court of Appeals."). This holding conflicts with the holding in *Philadelphia Newspapers*.

### B.     The Bankruptcy Court's Finding that THL's Credit Bid Was Not a Final Offer Is Not Clearly Erroneous

THL argues that, setting aside the lack of legal support for Polk's theory, the Order must also be affirmed because Polk's theory is based on the erroneous characterization of THL's credit bid as a "final" bid when the Bankruptcy Court found otherwise. *Aerogroup*. 601 B.R. at 589 ("[T]he evidence shows that THL's credit bid was not a final offer."). The Court agrees.

Even assuming that this Court were to adopt Polk's view that a secured creditor caps its secured claim by making a credit bid, regardless of whether that bid is successful, Polk's position requires that the secured creditor's bid be a "final" bid. Indeed, Polk frames one of the issues on

appeal as whether THL's "final credit bid" capped the value of its collateral. (*See* D.I. 10 ¶ 1; *see also id*. at 1, 3, 6, 9, 16).

The Bankruptcy Court held in the Summary Judgment Decision that whether THL's credit bid was a "final" bid was a disputed issue of material fact. *See Aerogroup*, 2018 WL 3155250, at *3. The Bankruptcy Court later resolved that issue in THL's favor in the Allocation Decision. The Bankruptcy Court found that "the evidence show[ed] that THL's credit bid was not a final offer," and that THL had "temporarily refrain[ed] from bidding, but reserved its right to resume credit bidding if other bidders did not bid amounts satisfactory to THL." *Aerogroup*, 601 B.R. at 589. The record supports this finding.

The evidence showed that THL was prepared to continue making further bids at the Auction, yet voluntarily chose not to do so unless and until it became necessary to keep driving up the bidding price at the auction to protect the value of its collateral. (*See* AA00260, AA00261 (Handy Decl. ¶¶ 6, 13). At the Sale Hearing held the day after the Auction, THL's counsel stated:

> . . . in the event that [the Alden Bid fails] I think we would need an opportunity to then credit bid on our collateral because we don't believe the value attributed to our collateral, by virtue of this back-up bidder, is sufficient. So I can't stand here before you today and say that this back-up bid is okay for my client.

(AA0092, 2/16/18 Hr'g. Tr. at 32:5-10). By reserving THL's rights to credit bid in the event that the Alden Bid failed, THL's credit bid was not "final." Debtors' counsel also acknowledged at the Sale Hearing that THL reserved its rights throughout the entire auction process and continued to reserve its rights during the Sale Hearing.[10] Moreover, counsel for the Debtors confirmed

---

[10]   *See* AA0092-AA0093 (2/16/18 Hr'g. Tr. at 32:24-33:1) ("If [the Alden bid] does not close then we understand Mr. Murphy reserving his rights as he has done throughout. And we were talking about that's [sic] the back-up bid."); *see also* AA0094 at 34:8-15 ("And although not a consultation party, we did ask THL to say that they accepted this bid as the highest and best because we were always concerned throughout the process that there would be a credit bid and we had done all of this for not [sic]; nobody wanted to do all of

15

THL's version of events in both a declaration (AA00266-AA00268) and at the Bankruptcy Court's June 12, 2018 telephonic hearing. At the hearing, Debtors' counsel stated that THL's counsel "is . . . one hundred percent correct" in his recollection of the Auction proceedings — that the Debtors requested that THL refrain from further credit bidding so that "[the Debtors] could get the auction going." (*See also* AA00254 (6/12/18 Hr'g. Tr. at 10:5-8); AA00255 at 11:2-6 (the Debtors "didn't want THL to keep credit bidding because then we weren't getting any bidding at the auction at all. And, so we asked them to stand down without having a fight because we would have had exactly the fight you have now.").

Polk cites exchanges between THL and Debtors' counsel during the Auction which Polk argues contradict their interpretation of controlling law now. (D.I. 22 at 1-2). Polk cites the two statements by Debtors' counsel. The first is to THL's counsel, made immediately after THL's submission of the THL Credit Bid: "you're making the value of the collateral that amount." (*See* A137 at 140:15-18). According to Polk, by this statement, "Debtors' counsel advised THL about . . . the legal effect of its credit bid." (*Id.* at 2). Polk argues that THL's counsel did not dispute the statement, nor did THL dispute Debtors' counsel's second statement to THL: "[Y]ou can buy your IP, all the way up to $20 million . . . [Y]ou can take . . . home your collateral for $20 million, if you want to." (A138 at 144:24–145:6). Polk argues that THL's answering brief ignores these exchanges as if they never occurred.

Although THL does not address these statements, it is unclear to the Court how the statements are inconsistent with the law of this circuit that (1) at the time the credit bid is made, it temporarily sets the value of the secured creditor's collateral, just as a cash bid would, and to the

---

this for not [sic], but as Mr. Murphy has said if the proceeds aren't high enough they have reserved their rights."); *see also* AA00261 (Handy Decl. ¶ 9); AA00265 (Cleary Decl. ¶ 15).

16

extent a subsequent cash bid surpasses the credit bid, then that greater cash bid sets the value of the secured creditor's collateral, and (2) a secured creditor may credit bid up to the entire face amount of its claim when its collateral is being sold at a bankruptcy auction. It is unremarkable that here (1) THL's Credit Bid was later exceeded in the Auction, and (2) although THL had the right to credit bid a higher amount, up to the entire face amount of its claim, THL chose not to do so. Counsel's statements made during the Auction are not inconsistent with controlling law, nor do they shed additional light on the issue on appeal. Even if the counsel's statements were inconsistent with controlling law, they do not render the Bankruptcy Court's finding that the THL Credit Bid was not a "final" bid clearly erroneous, as that finding is hardly "devoid of minimum evidentiary support" as would be required for reversal.

If the Bankruptcy Court was incorrect in holding that THL's credit bid was not a final bid, Polk has failed to shows how that factual determination was clearly erroneous. The Court finds no basis to overturn this factual finding on appeal.

## IV.  CONCLUSION

The Bankruptcy Court correctly rejected Polk's argument that a creditor's secured claim is capped by a credit bid that is subsequently exceeded by a higher bid, and the Third Circuit decisions cited by Polk do not compel a different outcome here. The Court finds no basis to overturn the Bankruptcy Court's finding that the THL Credit Bid was not a final bid. Accordingly, the Order (Bankr. D.I. 1132) shall be affirmed. A separate Order shall be entered.